**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Design Basics, LLC,                                    Case No. 3:15CV666

                    Plaintiff

          v.                                                     **ORDER**

Forrester Wehrle Homes, Inc., et al.,

                    Defendants

This is a copyright-infringement case.

Plaintiff Design Basics, LLC (DB), creates, markets, and licenses architectural plans for single-family homes. (Doc. 58 at ¶1). It contends that defendants – Forrester Wehrle Homes, Inc.; Wehrle Development, Ltd.; and their principals Jeffrey, Richard, and Joseph Wehrle (collectively, FWH) – infringed DB's copyrights in twenty-three architectural plans. (*Id.* at ¶¶35–36). The defendants allegedly did so by copying DB's plans, marketing the copied plans, creating unauthorized derivative works, and using DB's plans to build homes. (*Id.* at ¶¶44–59).

Pending are, *inter alia*, the defendants' motions for summary judgment on the issue of substantial similarity (Doc. 82) and to exclude the declaration of Carl Cuozzo. (Doc. 97). Because FWH has not shown that no reasonable jury could find that its designs are substantially similar to DB's works at the protected level of expression, I deny the motion for summary judgment. I also deny the motion to strike.

## Background

DB is an architectural-design firm based in Omaha, Nebraska. (Doc. 58 at ¶¶1, 10). Since the 1980s, DB has "marketed its original custom and ready-made home plans for single and multi-family homes through plan catalogs, home building industry publications . . . client-specific publications, and the internet." (Doc. 83–1 at 2). DB holds copyrights in roughly 2,000 home designs. (Doc. 82–1 at 8); *see also Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1096 (7th Cir. 2017) ("[DB] and their affiliates claim rights to some 2700 home designs.").

Characterizing itself as "a leader in the residential home plan industry" (Doc. 83–2 at ¶19), DB observes that, each year between 1998 and 2005, it generated an average of $4 million by licensing its design plans. (*Id.* at ¶20). After the housing-market collapse of 2008, however, DB's licensing revenues shrank by seventy-five percent. (*Id.* at ¶¶20). DB's owners started looking for someone to take over the business, and, in 2009, Myles Sherman and Patrick Carmichael purchased DB. (*Id.* at ¶¶4, 7).

Since the change in ownership, DB has "authored approximately 350 new original architectural works[.]" (*Id.* at ¶22).

The company also began undertaking copyright litigation in federal courts across the country. *Lexington*, *supra*, 858 F.3d 1096–97 (noting Carmichael's testimony that "proceeds from litigation have become a principal revenue stream for [DB]"). Based on a search of the Public Access to Court Electronic Records (PACER) database, it appears that DB has filed at least 103 copyright infringement lawsuits since June, 2009, with the vast majority of the filings coming in or after 2013. As the Seventh Circuit recognized, the flood of litigation is a product of the company's internal and acknowledged "bounty program." According to Sherman, "[t]heft of DB's readily available

copyrighted works is rampant and has been for nearly two decades – since the rise of the internet and the ready availability of its plans." (Doc. 83–2 at ¶10). Accordingly, DB "offers its employees incentives to scout out potential copyright infringement cases, paying its employees a finder's fee in the form of a percentage of the net recovery relating to any home plans that they located" on the Internet. *Lexington, supra,* 858 F.3d at 1097.

## A. DB's Relationship with FWH

FWH is a family-run business located in Maumee, Ohio, that builds homes in Northwest Ohio and Southeastern Michigan. (Doc. 81–1 at 4–10; Doc. 87–2 at ¶¶1–2).

The relationship between DB and FWH dates back to 1993, when DB licensed two of its architectural plans – the Ashton and the Albany – to FWH. (Doc. 58 at ¶37). Since then, DB, whether on its own initiative or at the request of FWH, mailed at least fifteen of its catalogs containing additional architectural designs to FWH. (*Id.*; Doc. 83–3 at ¶29).

In March, 2013, while DB was preparing "marketing efforts" in Ohio, the company "became aware that [FWH] had violated its copyrights in one or more distinct ways." (Doc. 58 at ¶35). DB acquired this information when its "senior designer," Carl Cuozzo, visited FWH's website and concluded that FWH's designs infringed DB's copyrighted plans. (Doc. 83–3 at ¶4).

## B. Litigation

DB filed this suit in April, 2015, alleging that FWH's designs infringed DB's copyright in fifteen copyright works. (Doc. 1 at ¶26).

### 1. Infringement Claims

In November, 2016, DB filed its second amended complaint. This complaint alleged that twenty-nine of FWH's plans infringed DB's copyright in twenty-three of its own designs. (Doc. 58

at ¶¶35–36). It also alleged that FWH used either DB's plans, or plans FWH made by copying DB's plans, to build more than three hundred homes in Northwest Ohio.

There are nine counts in the second amended complaint:

- Count One: Infringement of DB's copyrighted works by "scanning, copying, and/or reproducing unauthorized copies thereof," in violation of 17 U.S.C. § 106(1).

- Count Two: Infringement of DB's copyrighted works by "publicly displaying on [FWH's] website(s) and elsewhere, for purposes of advertising and marketing, unauthorized copies or derivatives thereof," in violation of 17 U.S.C. § 106(5).

- Count Three: Infringement of DB's copyrighted works by "creating derivatives therefrom in the form of two dimensional plans and fully constructed residences," in violation of 17 U.S.C. § 106(2).

- Count Four: Infringement of DB's copyrighted works by "advertising, marketing, and/or selling one or more houses based upon copies or derivatives of said works," in violation of 17 U.S.C. § 106(3).

- Counts Five through Eight: Infringement as described in Counts One through Four committed "willfully."

- Count Nine: Violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1202, *et seq.*, by "remov[ing] and omitt[ing] DB's copyright management information from copies of DB's works," and distributing copies or derivatives of such works with the knowledge that distributing them without DB's copyright management information would induce and facilitate further infringement of DB's copyrights.

(Doc. 58 at ¶¶45, 47, 49, 51, 53, 55, 57, 59, 61–64).

FWH originally asserted an "independent creation" defense to DB's claims, but it later withdrew the defense "with prejudice" as to all of the allegedly infringing works except FWH's Franklin design. (Doc. 49 at 18–19).

## 2. Earlier Proceedings

Discovery closed in mid-April, 2017, and, after I denied FWH's belated, eleventh-hour motion to extend fact discovery (Docs. 73, 77), summary-judgment practice got underway in July, 2017. The defendants filed: 1) a motion for partial summary judgment on statute-of-limitations grounds (Doc. 81); 2) a motion for summary judgment on the issue of the substantial similarity of the parties' works (Doc. 82); and 3) the motion to strike Cuozzo's declaration (Doc. 97).

DB filed its own motion for partial summary on the issues of FWH's access to its designs and the validity of DB's copyrights. (Doc. 83). It also filed motions to strike and exclude the reports of defendants' experts John D. Gugliotta and Richard Kraly. (Docs. 84, 89).

By order entered November 14, 2017, I granted in part and denied in part FWH's motion to exclude Kraly's original report and granted in full the motion to exclude Kraly's supplemental report. *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 2017 WL 5467152 (N.D. Ohio) (*Design Basics I*).

In a separate order issued that day, I concluded that the parties' briefs were insufficient to allow me to determine "whether there is a triable issue on the question of the works' substantial similarity." *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 2017 WL 5444569, *1 (N.D. Ohio) (*Design Basics II*).

For one thing, DB misrepresented the state of the law by claiming that the Sixth Circuit had yet to provide "a clear and unequivocal method of analyzing substantial similarity for architectural works." (Doc. 89 at 32). As I explained – and as a Magistrate Judge of this District had previously explained to DB's counsel when counsel raised this same argument in an earlier case, *see Design*

*Basics, LLC v. Petros Homes, Inc.*, 2017 WL 2842783, *2 (N.D. Ohio) (Parker, J.) – the Sixth

Circuit evaluates the substantial similarity of all copyrighted works under a two-step framework:

> [T]he first step requires identifying which aspects of the artist's work, if any, are
> protectible by copyright; the second involves determining whether the allegedly
> infringing work is substantially similar to protectible elements of the artist's work.
> We approve this method and adopt it.
>
> The essence of the first step is to filter out the unoriginal, unprotectible elements –
> elements that were not independently created by the inventor, and that possess no
> minimal degree of creativity – through a variety of analyses.

*Design Basics II*, *supra*, 2017 WL 5444569 at *2 (quoting *Kohus v. Mariol*, 328 F.3d 848, 853

(6th Cir. 2003)).

Contrary to DB's representation, the Circuit had applied this two-step filtration test to

architectural works specifically in *Tiseo Architects, Inc. v. B & B Pools Serv. & Supply Co.*, 495 F.3d

344, 345 (6th Cir. 2007) ("Because the district court properly analyzed the similarity of the works

after filtering out the unprotectable elements of Tiseo Architects' drawings, the judgment of the

district court is affirmed.").

For its part, FWH focused on explaining "why certain constituent elements of DB's plans .

. . are not themselves original or copyrightable." *Design Basics II*, *supra*, 2017 WL 5444569 at *3.

This focus was misguided, I concluded, because:

> I do not understand DB to be claiming a copyright in these kinds of standard features
> or elements, which the Copyright Act in any event excludes from protection. *See* 17
> U.S.C. § 101. Rather, DB seems to claim copyright protection in the allegedly unique
> way in which it has arranged these kinds of elements in each of its home designs. Yet
> the defendants' briefs and supporting materials devote less attention to that question.

*Id.*

Accordingly, I directed the parties to file supplemental briefs on the question whether, "viewing the evidence in the light most favorable to DB, a reasonable jury could find that FWH's design plans are substantially similar to DB's plans at the protected level of expression." *Id.* at *3.

More specifically, I ordered FWH to identify "what parts of DB's architectural work – the overall look and feel, the selection, composition, and arrangement of standard or unprotected elements, or other design choices and elements – amount to unprotected expression and to protected expression." *Id.* at *5. In doing so, I directed FWH to "support such claims by citing to the record," with all citations in compliance with Fed. R. Civ. P. 56(c)(1). *Id.* As to DB, I ordered it to "identify, with as much specificity as the record permits – and by citing to the record in accordance with Fed. R. Civ. P. 56(c)(1) – what parts of its architectural works amount to protected expression." *Id.* at *6.

## Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

**Discussion**

To prevail on an infringement claim, a copyright holder must establish that: 1) it owns a valid copyright in the work at issue; 2) the defendant copied its work; and 3) the copying was wrongful. *Kohus*, *supra*, 328 F.3d at 853. As I explained in *Design Basics II*, *supra*, 2017 WL 5444569 at *1:

> The plaintiff can prove copying "with either direct evidence of copying," or, as DB attempts to do here, "through an inference of copying." *Robert L. Stark Enterprises, Inc. v. Neptune Designs Grp., LLC*, 2017 WL 1345195, *5 (N.D. Ohio) (Gaughan, J.).
>
> To generate an inference of copying, the copyright owner must show "(1) access to the allegedly-infringed work by the [infringer] and (2) a substantial similarity between the two works at issue.'" *Id.* (quoting *Kohus*, *supra*, 328 F.3d at 853–54).
>
> Because "[n]ot all copying . . . is copyright infringement," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991), the plaintiff must establish that "the defendant's work is 'substantially similar' to protectible elements of the plaintiff's work," *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295 (D.C. Cir. 2002). Thus "the term substantial similarity is properly reserved for similarity that exists between the protected elements of a work and another work." *Zalewski* [*v. Cicero Builder Dev., Inc.*,] 754 F.3d [95], 101 [(2d Cir. 2014)].

"To determine whether an instance of copying is legally actionable, a side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as substantially similar." *Lennar Homes of Tex. Sales & Marketing, Ltd. v. Perry Homes, LLC*, 117 F. Supp. 3d 913, 933 (S.D. Tex. 2015); *see Kohus*, *supra*, 328 F.3d at 857 ("the inquiry in the second prong of the substantial similarity test should focus on the intended audience," which "will ordinarily be the lay public") (internal emphasis omitted).

**A. Protected Level of Expression in Architectural Works**

An architectural work" is "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." 17 U.S.C. § 101.

8

Copyright protection in such works extends to "the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." *Id.* Nor does protection extend to the "standard configurations of spaces as well as common windows, doors, and other staple building components." *Lennar Homes*, *supra*, 117 F. Supp. 3d at 934.

To decide if there is a triable issue as to the works' substantial similarity, I must first identify the protected level of expression, if any, in DB's architectural works.

"To qualify for copyright protection, a work must be original to the author." *Feist*, *supra*, 499 U.S. at 345. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* "To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* "The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Id.*

"Because DB holds certificates of copyright registration" in the allegedly infringed works, "I presume its designs satisfy the 'extremely low' creativity threshold for originality." *Design Basics I*, *supra*, 2017 WL 5467152 at *4 (quoting *Feist*, *supra*, 449 U.S. at 345).

"[T]he essence" of the first step of the filtration analysis "is to filter out the unoriginal, unprotectible elements – elements that were not independently created by the inventor, and that possess no minimal degree of creativity – through a variety of analyses." *Kohus*, *supra*, 328 F.3d at 855; *see also Tiseo Architects*, *supra*, 495 F.3d at 348.

Several tools are available to courts trying to separate the protected expression from the unprotected in cases involving architectural works. The case law:

endorses the use of both the *scenes a faire* doctrine (*i.e.*, a scene that must be included in a work) and the doctrine of merger to "filter out" unprotected elements. As the Second Circuit explained in *Zalewski*, *supra*, 754 F.3d at 102:

> [T]he doctrine of *scenes-a-faire* teaches that elements of [a] work that are indispensable, or at least standard, in the treatment of a given topic – like cowboys, bank robbers, and shootouts in stories of the American West – get no protection. Similarly, the merger doctrine instructs that some ideas can only be expressed in a limited number of ways – single words or colors for example. When expression is so limited, idea and expression "merge." Expressions merged with ideas cannot be protected, lest one author own the idea itself.

*Design Basics II*, *supra*, 2017 WL 5444569 at *4.

Similarly, courts have recognized that "external considerations – that is, industry standards, consumer expectations, zoning requirements, and the like – can limit the amount of protected expression within architectural works." *Id.* (citing *Zalewksi*, *supra*, 754 F.3d at 105).

With these principles in mind, I turn to the parties' arguments about what constitutes protected expression in DB's architectural works.

## B. Parties' Arguments

In its supplemental brief, DB claims that copyright protection extends inclusively to:

- The "overall form" or the "look and feel" of the homes it designed (Doc. 118 at 4);

- The "arrangement and composition of spaces and elements across the first and second floors" of the houses (*id.* at 4, 8);

- The "program of the architectural work – i.e., the nature and quantity of the rooms and elements," (*id.* at 7);

- The "three-dimensional alignment of the spaces and elements," (*id.* at 8); and

- The "outside elevations in large massing, small massing, fenestrations and openings," (*id.*).

In their supplemental briefs, defendants contend that none of these elements or components of DB's works is entitled to copyright protection.

FWH claims that "there are not any protected elements in the designs at issue after the doctrines of *scenes a faire* and merger are applied." (Doc. 115 at 6). It also argues that "external considerations eliminate any protected expression within the designs at issue." (*Id.*). Defendants further maintain that "there is no protected expression in the overall look and feel of the designs at issue." (*Id.*). Finally, FWH argues that, even if "any of the designs at issue had any protected expression," the differences between FWH's works and the protected expression in DB's works would preclude a finding that the works are substantially similar.

### 1. Kraly's Report

To support these claims, FWH relies on the report of its expert, Ohio architect Richard Kraly. (Doc. 115 at 33, 34, 35, 37, 46).[1]

The crux of Kraly's opinion is that "the total composition of each [of DB's architectural works] is the direct result of standard pieces / parts and relationships which include industry-accepted and client-expectations for room sizes, industry and client-desired relationships of the interior rooms and specific functions of the individual rooms that determine their placement in the overall scheme." (Doc. 82–7 at 9).

According to Kraly, no arrangement of expression of exterior or interior elements – roof planes, doors, windows, ceilings, or "walk-and-pass through openings" – is protected, because all

---

[1] Kraly's report and its supporting exhibits run to 137 pages, but, in attempting to prove that DB's works contain no protected expression, FWH relies exclusively on four pages of his opinion. Accordingly, I have limited my review of the report to those four pages. *See Design Basics II*, *supra*, 2017 WL 5444569 at *5–6 (forbidding parties to incorporate expert reports into their supplemental briefs by reference and directing parties to cite the record to support their assertions).

such "expression" is "standard to the industry, details within the public domain and are functional elements." (*Id.* at 5). In making this claim, however, Kraly did not attempt to demonstrate how functionalism, industry standards, or details within the public domain required DB to make any of the countless design choices the company made in composing the plans at issue. (*Id.* at 5–6, 9–10).

Kraly also opined that "[t]he arrangement of individual living spaces" is unprotected because all such arrangements "are usual and customary to the design and construction of residences." (*Id.* at 5). Once again, Kraly did not explain how "usual and customary" space arrangements dictated that DB make any particular design decisions in any of the plans at issue.

Next, Kraly opined that all "[r]oom sizes are usual and customary to accommodate furniture and passage through areas based upon the intended use of the space." (*Id.* at 6). He observed that: 1) room heights vary between eight and ten feet; 2) "[t]he top / head levels of window[s] usually align with the top edges of doors;]" and 3) kitchen and bathroom countertops are usually thirty to thirty-six inches above the floor. (*Id.*).

In the next paragraph of his report, Kraly declared that "[f]eatures within rooms are standard / functional with details specific to the intended use" of the room. (*Id.*). To illustrate the point, Kraly noted that kitchens and bathrooms regularly include "cabinets / countertops and plumbing fixtures." (*Id.*).

Kraly then opined that, in the home-construction field, builders and contractors rely on "standard materials" like "2x4 / 2s6 wall studs, floor joists of 2x_ joists and / or truss joists." (*Id.*). It is also common, Kraly continues, to use "fiberglass shingles, clay tile, slate, wood shakes or metal panels" to build a roof. (*Id.*).

Kraly also observed that "[t]he planning, design and on-site construction of residences are required to comply with specific residential building codes" that may, consequently, dictate the appearance, size, or arrangement of a given house or its interior. (*Id.*). Kraly did not, however, cite to any particular building code that might have affected how DB designed its plans.

Finally, Kraly opined that builder and consumer preferences affect "design and construction practices." (*Id.*). According to Kraly, builders generally prefer that "rooms with plumbing fixtures . . . be clustered for efficiency of water supply and drain lines to that area of the house." (*Id.*). Likewise, customers prefer: 1) to "separat[e] master bedroom suites from children [*sic*] bedrooms"; 2) "inclusion of in-kitchen countertop for casual dining plus adjacent breakfast area"; and 3) attached garages to avoid exposure to weather. (*Id.*).

Again, however, Kraly did not elaborate on how such preferences might have caused DB to make certain design choices that would deprive DB's works of copyright protection. *Cf. Tiseo Architects*, *supra*, 495 F.3d at 348 (no protected expression where plaintiff based many elements of its architectural sketches on the client's original sketches).

### 2. DB's Supplemental Brief

In its opposition brief, DB argues that, under Kraly's opinion, "every element and arrangement in a residential design would not be protected expression because they are all 'standard' or 'functionally-required.'" (Doc. 118 at 11).

DB contends that adopting this mode of analysis would "eviscerate" the Architectural Works Copyright Protection Act, 104 Stat. 5089 – the federal law that extended copyright protection to architectural works, *see, e.g.*, *Chirco v. Gateway Oaks, LLC*, 2005 WL 1355482, *4 (E.D. Mich.) – and "ignore[ ] the creativity of a professional architect[.]" (Doc. 118 at 12).

13

By way of a hyperbolic example, DB argues that not even Frank Lloyd Wright's Fallingwater would contain protected expression under Kraly's mode of analysis. This is so, DB contends, because at the most granular level even Fallingwater comprises "functionally required and standard elements such as roof planes, windows, doors, walls, ceilings, [and] floors," and contains "standard arrangements of rooms, such as a dining room adjacent to a kitchen, a great room . . . displacing formal living rooms, [and a] clustering of bedrooms and bathrooms[.]" (*Id.*).

Homing in on the particulars of Kraly's opinions, DB contends that "[i]ndustry standards dictate only how a building is put together[,] not how it is actually designed." (*Id.* at 17). While standards may exist for tasks like hanging drywall, pouring concrete, and "toenailing wood structures," DB contends that "[n]one of these standards affects the design of the house." (*Id.*). To the contrary, DB asserts – without citation to any evidence – "the design of the work dictates the required industry standards." (*Id.*).

Regarding the role of consumer expectations and zoning requirements, DB argues that they are "not universal, but instead vary from state to state." (*Id.*).

Finally, DB disputes FWH's attempt to pigeonhole its architectural works as belonging to a recognized architectural style: the "conventional, modestly priced" home. According to DB, FWH has not identified "which specific features and/or arrangements of spaces and elements [in its works] are dictated by such a vaguely categorized 'style' of housing." (Doc. 118 at 18). Nor have defendants provided evidence "to support [their] argument that the 'conventional, modestly priced' style house requires the placement or the arrangement of features in any specific way." (*Id.*).

### 3. Case Law

Past cases attempting to define the protected level of expression in architectural works start with two "first principles."

"[S]tandard features" – a door, a window, a kitchen – "incorporated into architectural works are not protected *per se*[.]" *Frank Betz Assocs., Inc. v. J.O. Clark Constr., L.L.C.*, 2010 WL 4628203, *3 (M.D. Tenn.)

But "the creator's independent selection and arrangement of component parts into an overall, original design generally will be protected." *Id.*; *accord Architects Collective v. Pucciano & English, Inc.*, 247 F. Supp. 3d 1322, 1342 (N.D. Ga. 2017) ("creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectable elements into an original, protectable whole"); *Design Basics, LLC v. J & V Roberts Inves., Inc.*, 130 F. Supp. 3d 1266, 1278–81 (E.D. Wisc. 2015) (same); *Lennar Homes*, *supra*, 117 F. Supp. 3d at 934 ("individual features that reflect the architect's creativity are not excluded").

These cases also establish that an "independent selection and arrangement of component parts into an overall, original design" does not require that an architect create something like Fallingwater or the Guggenheim. *J & V Roberts*, *supra*, 130 F. Supp. 3d at 1278 (DB's designs for single-family homes "are not architecture designs for the Sagrada Familia or the Taj Mahal," but a jury could nevertheless find they contain protected expression). Rather, the protected level of expression in architectural works often encompasses relatively modest or even mundane design choices.

In thorough, well-reasoned opinions, district courts have found that protected expression in home designs includes:

- The "placement of various doors and closets, the use of a double window in lieu of a sliding glass door, and the differences in the size of certain room openings and closets." *Architects Collective*, *supra*, 247 F. Supp. 3d at 1368–69.

- The placement of the front door, the presence of a hallway next to a staircase, the location of a half-bath in relation to the stairway, the arrangement of fixtures in a kitchen, and the nature and dimensions of an external patio adjacent to a breakfast room. *Lennar Homes*, *supra*, 117 F. Supp. 3d at 945.[2]

- The arrangement of rooms in a design plan, as well as "the placement of countertops, wet bars, and closets" within those rooms and throughout the house. *J & V Roberts*, *supra*, 130 F. Supp. 3d at 1278.

### C. Reasonable Jurors Could Find That DB's Plans Include Protected Expression

Given cases like *Architects Collective*, *Lennar Homes*, and *J & V Roberts*, I agree with DB that copyright law protects the arrangements of standard elements for which DB seeks protection: the "overall form" or the "look and feel" of the homes, the "arrangement and composition of spaces and elements across the first and second floors" of the houses, and "program of the architectural work – i.e., the nature and quantity of the rooms and elements." (Doc. 118 at 4, 7–8); *cf. Design Basics I*, *supra*, 2017 WL 5467152 at *4 (DB's copyright registrations create presumption that its copyrighted works are original).

The question then becomes whether FWH has introduced sufficient evidence to permit a jury to find that DB's works are unprotected, whether because external considerations dictated the designs, because no original expression remains after applying the merger and *scenes a faire* doctrines, or for some other reason. *Cf. Zalewski*, *supra*, 754 F.3d at 104 ("The challenge in

---

[2] The court in *Lennar Homes*, *supra*, held that minor differences in these kinds of arrangements precluded a finding of substantial similarity, which implies that these kinds of modest design choices constitute protected expression.

adjudicating copyright cases is . . . to determine what in it originated with the author and what did not.").

FWH attempts to satisfy this burden with Kraly's opinion that essentially every design choice DB made in each of its plans is unprotected expression. Having viewed this evidence in the light most favorable to DB, I conclude that Kraly's opinion is, for at least two reasons, insufficient to establish that any reasonable juror would conclude that DB's works contain no protected expression.

### 1. Impermissible Legal Conclusions

First, Kraly's opinion is in significant – and perhaps irreconcilable – tension with the persuasive case law finding that copyright protection in architectural works extends to an author's arrangement of standard, unprotected design elements.

According to Kraly, any such arrangement in the design for a single-family home – be it a window placement, room placement within the floor plan, or fixture placements within a given room – is unprotected expression. (Doc. 82–7 at 5–7). This is so, Kraly maintains, because such arrangements are "usual and customary to the design and construction of residences." (*Id.* at 5).

But as district courts nationwide have concluded, copyright protection in plans for residential homes extends to precisely those kinds of design choices. *See Architects Collective*, *supra*, 247 F. Supp. 3d at 1342; *J & V Roberts*, *supra*, 130 F. Supp. 3d at 1278–81; *Lennar Homes*, *supra*, 117 F. Supp. 3d at 934; *Frank Betz Assocs.*, *supra*, 2010 WL 4628203 at *3.

Much of Kraly's report on this score therefore reads like an expert giving an impermissible – and, in this case, an incorrect – legal conclusion. As I explained in *Design Basics I*, *supra*, 2017 WL 5467152 at *4, when I granted the motion to exclude Kraly's report in part:

[Kraly] examine[d] DB's design plans and conclude[d] that they lack 'original expression' necessary to meet the restrictions of a copyright designation.

Kraly's belief that DB's designs do not merit copyright protection is a legal conclusion – and a subject on which I do not need the judgment of witnesses. Thus, insofar as the original report offers opinions that plaintiff's copyrights are meaningless and of no value . . . these opinions must be excluded.

Thus, to the extent Kraly opines that basic design choices are not entitled to copyright protection, I reject his opinion as an impermissible, and incorrect, legal conclusion.

## 2. Unsupported Opinions

Second, two critical parts of Kraly's opinion are: 1) his conclusion that external considerations dictated all of DB's design choices, such that the ensuing designs are not original to DB (Doc. 82–7 at 5–6); and 2) his assertion that all of DB's design choices are unprotected because those choices are usual and customary for the style of architecture at issue (*id.* at 10).

To the extent Kraly opines that external factors and genre conventions can dictate design choices, his opinion is unproblematic. The Sixth Circuit recognized as much in *Tiseo Architects*, *supra*, 495 F.3d at 348 (client's wishes, as expressed in prior sketches, limited the amount of protected expression in plaintiff's work), and I accepted as much in *Design Basics II*, *supra*, 2017 WL 5444569 at *3–4 (merger and *scenes a faire* doctrines can limit protected expression).

But Kraly's opinion that DB's designs contain no protected expression whatsoever proves too much and too little.

Taken at face value, his blanket assertion that "the total composition of each [DB design] is the direct result of standard pieces / parts and relationships" (Doc. 118 at 11) means that no architectural design for a home can contain protected expression. As DB correctly observes, every home, at the root level, exists as a composition of "standard pieces / parts and relationships," the

structure and appearance of which flows, in some measure, from "industry-accepted and client expectations" for room sizes and arrangements. (*Id.*). Courts have held, however, that architects are entitled to copyright protection when they arrange these features in original ways.

More importantly, Kraly failed to demonstrate – failed even to opine with the faintest degree of specificity – how the external considerations he identified in his report controlled, dictated, or affected the specific design choices DB made when composing the plans at issue. Without such evidence, a reasonable jury would have no basis – other than pure speculation – to conclude that DB's design choices are unprotected. *Cf. Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) ("conjecture or conclusory accusations" cannot support a grant of summary judgment).

### a. External Considerations

As noted above, Kraly opined that industry standards, customary practices, and functional considerations influence "the design and construction of residences." (Doc. 82–7 at 5–6; *see also id.* at 10). But Kraly never explains how any particular industry standard or functional concern – or any external consideration at all – dictated the scores of design choices that DB made in composing its architectural works.

This omission in Kraly's report comes into focus when one examines his opinion alongside the specific design choices that DB contends represent protected expression. To take but one example, DB alleges that FWH's Alexander plan infringes its Kaiser plan. Both are designs for a three-bedroom, two-and-a-half-bathroom home. According to DB, the Kaiser includes several original design elements (all of which FWH allegedly copied when composing the Alexander):

- Placing the half-bath on the first floor adjacent to the master bedroom, even though the "Powder Room, provided for guests' convenience, is [ordinarily] located away from private areas of the plan." (Doc. 118 at 23).

19

- Use of a "bay bump-out" window on the first floor. This was "a purely aesthetic decision by DB that is not required for the functionality or performance of the room." (*Id.*).

- Arranging a unique hallway shape on the second floor that "mirror[s] angled doors across from one another" and "plac[es] the Bathroom and linen closet on the opposite side of the long end of the hallway, split by the stair." (*Id.*).

Nevertheless, Kraly's report does not explain how an external factor – be it customer or builder preferences, a zoning code, functionalism, or a combination thereof – dictated that DB incorporate these features into the Kaiser. And though DB has alleged that each of its other plans incorporate similarly protected design choices (Doc. 118–1 at 2–19), Kraly's report similarly fails to address how external considerations dictated those choices, so as to strip those designs, in whole or in part, of protected expression.

For these reasons, Kraly's opinion does not permit a reasonable jury to conclude that DB's plans contain no protected expression.

### b. Stylistic Conventions

Likewise, Kraly failed to substantiate his opinion that all of DB's design choices are unprotected because those choices are "standard and customary" to the design of single-family homes. (Doc. 82–7 at 10).

To begin, Kraly does not say what he means by a "standard and customary" style of residential homes. (*Id.* at 1–10). Nor does he identify the design features or characteristics that define this style of architecture. (*Id.*). Finally, Kraly does not explain how the conventions of this style dictated that DB design its plans in precisely the way it did. For example, Kraly does not discuss why stylistic conventions required DB to incorporate a bump-out bay window on the first floor of the Kaiser or why DB had to incorporate mirrored doorways in the second-floor hallway.

Given the absence of evidence establishing that stylistic conventions in fact controlled DB's design choices, this case is distinguishable from the Second Circuit's decision in *Zalewski*, *supra*, on which FWH heavily relies. (Doc. 115 at 23–27, 30–32).

The plaintiff in that case granted the defendants licenses "to use several colonial home designs he had created." *Zalewski*, *supra*, 754 F.3d at 98. He alleged that defendants infringed his copyrights by "customizing his designs for their customers" and marketing the customized designs without his consent. *Id.* at 99. According to plaintiff, the defendants "copied the overall size, shape, and silhouette of his designs, as well as the placement of rooms, windows, doors, closets, stairs, and other architectural features." *Id.*

On appeal, the Second Circuit affirmed a judgment in favor of the defendants. The court recognized that defendants had copied the plaintiff's work, but it held that what the defendants had copied was unprotected expression:

> "[M]ost of the similarities between Plaintiff's and Defendants' designs are features of all colonial homes, or homes generally. So long as Plaintiff was seeking to design a colonial house, he was bound to certain conventions . . .
>
> Plaintiff makes no attempt to distinguish those aspects of his designs that were original to him from those dictated by the form in which he worked. For example, Zalewski claims that the front porches are the same design, size, and in the same location. But a door centered on the front of the house is typical of many homes, and colonials in particular.

*Id.* at 107.

The Second Circuit pointed to "several treatises" in the record that "describe the basics of colonial architecture," and the court relied on that evidence to support its judgment. *Id.* at 106 n.20. Kraly's report, in contrast, is bereft of any citation to treatises or other learned sources that would permit a jury to find that stylistic conventions bound DB to design its homes in a particular way.

*Cf. J & V Roberts*, *supra*, 130 F. Supp. 3d at 1280 (holding, in a case featuring DB as the plaintiff, that "this case is distinguishable because the designs in question are not of a particular style, such as the colonial style discussed in *Zalewski*").

Perhaps it is the case, as the court in *J & V Roberts*, *supra*, 130 F. Supp. 3d at 1280, suggested, that "the style of 'conventional, modestly priced housing,' which the defendants allege [is] present in this case, may require certain specific features." But as that court likewise concluded, and as I conclude here:

> at this juncture in the case, it is not entirely clear what those features are. For example, the court in *Zalewski* found that the identical placement of the doors in the plaintiff's and defendant's designs did not show substantial similarity because a colonial style specifically required a door centered at the front of the house. In contrast, *the defendants have provided no evidence of this type to support an argument that the 'conventional, modestly priced' style of house requires the placement or the arrangement of features in any specific way.*

*Id.* (emphasis supplied).

In sum, DB has identified elements of its architectural works that qualify for copyright protection. (Doc. 118–1 at 1–19). Per my order, and by operation of Civil Rule 56, it was FWH's burden to introduce evidence that would preclude a reasonable jury from finding that those elements were protected. *Celotex Corp.*, *supra*, 477 U.S. at 323; *Design Basics II*, *supra*, 2017 WL 5444569 at *3, *5–6. Having failed to do so, FWH is not entitled to summary judgment on the ground that the infringed works contain no protected expression.

### D. Reasonable Jurors Could Find That DB's and FWH's Works Are Substantially Similar

FWH could still prevail if it shows that the undisputed evidence would not permit "a layman [to] view the two works as substantially similar." *Lennar Homes*, *supra*, 117 F. Supp. 3d at 933.

As the Sixth Circuit explained in *Kohus*, *supra*, 328 F.3d at 857, "the second prong of the substantial similarity test should focus on the intended audience. This will ordinarily be the lay public, in which case the finder of fact's judgment should be from the perspective of the lay observer or . . . the ordinary reasonable person." (Internal emphasis omitted). Under this test, two works are substantially similar if "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960).

FWH has offered evidence that each of its allegedly infringing works is meaningfully different than the corresponding DB work. According to Kraly,

> [t]he many differences between the residential designs prepared by [DB] and [FWH] provide evidence [FWH] did not copy [DB] designs but rather, both products contain similar (likeness and / or resemblance of) concepts, configurations, dimensions, materials, products, features, finishes and fixtures. [FWH's] designs at issue are the result of assembling the resources (systems and materials) available to local designers and builders within Ohio in response to client expectations in the local housing market as reflected by prevailing community standards.

(Doc. 82–7 at 10).

Kraly also produced a series of comparisons between each FWH design and the DB plan that it allegedly infringes. (Doc. 82–8 through Doc. 82–32).

Kraly concluded, for example, that FWH's Alexander design is not similar to DB's Kaiser because: 1) there is only one gable on the Alexander's roof, whereas there are two on the Kaiser; 2) the Alexander features wide rectangular windows, whereas the Kaiser uses narrower windows that extend further to the ground; 3) the Alexander's kitchen includes a U-shaped countertop, while the Kaiser features an L-shaped countertop; and 4) the entry from the Alexander's garage into the house

runs through a separate hallway, whereas the entry from the Kaiser's garage is through the laundry room. (Doc. 82–23).

DB responds that a reasonable juror viewing its and FWH's plans side-by-side could find that the works are substantially similar. (Doc. 118 at 22–49). Regarding the Kaiser and the Alexander, for example, DB contends that "[t]here are multiple substantial similarities of protected expression" in the two plans. (Doc. 118 at 22).

DB observes that "all spaces are located precisely in the same arrangement and composition with respect to adjacencies and position in the overall organization of the plan." (*Id.*). More specifically, this means that both designs: 1) include a "comma-shaped" master bedroom in the left rear corner of the plan; and 2) place the second-floor bedrooms over the garage and dining room. For another, DB contends that "the designs align exactly in three-dimension." (*Id.*). This means that, when one design is placed on top of the other, the dimensions, room placements, and spatial configurations match almost perfectly. (Doc. 89–5 at 2) (overlay of Kaiser and Alexander plans).

Having reviewed the Kaiser and the Alexander side-by-side, and having conducted a similar review of the other infringed and infringing works at issue, I conclude that a jury must decide whether the designs are substantially similar.

First, FWH failed to establish that no reasonable juror could find that DB's works contain protected expression. For that reason, I must accept DB's contention that the all of the design choices and features at issue amount to protected expression. Accordingly, the  ground on which a jury could base a substantial-similarity finding is far broader than it would be if Kraly had demonstrated that DB's designs, in whole or in part, lacked protected expression.

Second, a reasonable jury viewing this ground in the light most favorable to DB could easily conclude that the firms' designs are substantially similar. Indeed, to take only one example, the evidence practically compels such a finding with regard to the Kaiser and Alexander plans.

To be sure, there are some minor differences in the shapes of the windows and kitchen countertops, as well as in the number of gables on the roof. But glaring similarities abound across the plans. Both include: 1) a "comma shaped" master bedroom in the left rear corner of the first floor; 2) a half-bath on the first floor next to the master bedroom, despite a general preference to keep such a bathroom at a distance from the master bedroom; 3) identical bump-out bay windows in the same location on the first floor; and 4) identical hallways and mirrored doors on the second floor. (Doc. 118 at 23). These similarities are only magnified when one examines an overlay of the two plans, which tends to show that the Alexander is nearly an exact duplicate of the Kaiser. (Doc. 89–5 at 2).

For these reasons, a reasonable juror might "be disposed to overlook [the few differences], and regard [the designs'] aesthetic appeal as the same." *Peter Pan Fabrics*, 274 F.2d at 489.[3] Accordingly, I cannot say that, as a matter of law, the designs are so dissimilar that no reasonable jury could find for DB. *See J & V Roberts*, *supra*, 130 F. Supp. 3d at 1281 ("Although the defendants have pointed to numerous and identifiable differences, the Court nonetheless finds that the similarities weigh in favor of denying summary judgment.").

---

[3] The same analysis holds true, to a greater or lesser degree, as to each of FWH's allegedly infringing designs. Accordingly, I do not discuss each set of infringed and infringing works separately.

## E. Motion to Strike

FWH has also moved to strike the declaration of DB senior designer Cuozzo on the grounds that: 1) Cuozzo does not have personal knowledge of the matters he discusses (namely, how DB created the architectural works at issue, and whether they contain a minimal degree of creativity); 2) Cuozzo, though not offered as an expert, is essentially testifying as an expert in layman's clothing; and 3) the exhibits to his declarations – the side-by-side comparisons of DB's and FWH's designs and the plan overlays – are inadmissible hearsay. (Doc. 97).

Because I did not consider Cuozzo's declaration itself in deciding FWH's motion for summary judgment on substantial similarity, I deny the motion in part as moot.

Furthermore, three of the exhibits to Cuozzo's declaration – the plan elevations, which depict the fronts of the finished houses (Doc. 89–3); the side-by-side layouts, which place the first and second floors of each of DB's homes next to the first and second floors of the corresponding FWH home (Doc. 89–4); and the plan overlays, which place the DB plans on top of the allegedly infringing FWH plan (Doc. 89–5) – are pedagogical devices that I may consider on a motion for summary judgment. *U.S. v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998) ("Trial courts have discretionary authority to permit counsel to employ such pedagogical-device 'summaries' to clarify and simplify complex testimony or other information and evidence or to assist counsel in the presentation of argument to the court or jury.").[4]

---

[4] FWH's argument that I cannot consider these materials – and thus that I cannot look at the actual plans, side-by-side, in deciding the pending motion – is frivolous. The substantial-similarity test requires that the fact-finder conduct a side-by-side comparison of the infringed and infringing works. *Lennar Homes*, *supra*, 117 F. Supp. 3d at 932. The attachments to Cuozzo's declaration facilitate that process, allowing the fact-finder to identify both similarities and differences in the various plans. FWH does not contend, moreover, that these materials are inaccurate in any way, and the pedagogical devices do not include any comment or argument by Cuozzo or DB.

Finally, because I did not consider Doc. 89–6, which is Cuozzo's narrative comparison of the DB plans with their FWH counterparts, I deny the motion as to that exhibit as moot.

### F. Withdrawal of Claims

In their supplemental brief, DB represents that it is withdrawing the following claims:

- All claims that FWH's Franklin, Vera Cruz, and Lockport designs infringe on DB's copyrights;

- The claim that FWH's Custom design infringes DB's Kincaid design;

- The claim that FWH's Covington II design infringes DB's Bermier design; and

- The claim that FWH's Thompson design infringes DB's Paisley design.

(Doc. 118 at 21).

DB also clarifies that, "[b]ecause Defendant purchased licenses for DB's Ashton and Albany designs, DB only alleges that Defendants violated the DMCA by removing DB's copyright management information [ ] for these two works." (*Id.*).

Accordingly, these claims will be dismissed with prejudice.

## Conclusion

It is, therefore,

ORDERED THAT:

1)      FWH's motion for summary judgment on the issue of substantial similarity (Doc. 82) be, and the same here is, denied;

2)      FWH's motion to strike (Doc. 97) be, and the same hereby is, denied as provided herein; and

3)      DB's infringement claims be, and the same hereby are, dismissed with prejudice as provided on page 27 of this order and in accordance with DB's representations on page 21 of its supplemental brief.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge