**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Design Basics, LLC,                                  Case No. 3:15CV666

        Plaintiff

      v.                                          **ORDER**

Forrester Wehrle Homes, Inc., et al.,

        Defendants

      This is a copyright-infringement case in which the plaintiff, Design Basics, LLC (DB),

alleges that the defendants – Forrester Wehrle Homes, Inc.; Forrester Wehrle Development, Ltd.;

and their principals Jeffrey, Joseph, and Richard Wehrle (collectively, FWH) – infringed DB's

copyrights in a series of architectural plans.

      DB alleges that FWH copied its plans and/or used them without permission to build

single-family homes in Northwest Ohio and Southeast Michigan. It also brings related claims

under the Digital Millennium Copyright Act.

      Now that I have ruled on the parties' motions for summary judgment, and with the parties

having failed to resolve the case via private mediation, the case is ready for trial on the issues not

adjudicated in the summary judgment orders.

      Due to my unavailability to preside over a jury trial of the length (between ten and forty

trial days) currently anticipated by the parties, this case will be, upon my adjudication of the

parties' motions in limine (Docs. 153, 154, 158, 159, 160), reassigned to the Honorable Jack

Zouhary for all further proceedings. (Doc. 172).

This order sets forth my rulings on those motions.

## Discussion

### A. Testimony of Carl Cuozzo

The defendants first move to exclude the lay opinions of DB's "senior designer" Carl Cuozzo and the pedagogical devices that he prepared. (Doc. 153). Their motion (*id.*, PageID 1554) challenges the admissibility of Cuozzo's opinions that:

- Each of DB's architectural plans "demonstrate[s] a 'modicum of creativity.'" (Doc. 89–7, PageID 3666–67 at ¶7).

- Based on Cuozzo's comparison of each of FWH's plans to the DB plan that it allegedly infringed, the parties' plans are "substantially similar" so as to support an inference of unlawful copying. (*Id.*, PageID 3667 at ¶10).

- Each FWH plan contains many design similarities as the corresponding DB plan. (*Id.*, PageID 3667 at ¶11).

- Defense expert Richard Kraly's opinion that the defendants' plans are not substantially similar to DB's plans contains many "discrepancies." (*Id.*, PageID 3667 at ¶12).

Defendants argue that these opinions "rely on specialized knowledge and constitute impermissible lay witness testimony." (Doc. 153, PageID 6653). They also argue that the opinions will not be helpful to the jury. Instead, the defendants claim, the opinions are "helpful to DB only because they dictate the outcome of the . . . substantial similarity analysis." (*Id.*, PageID 6658).

FWH also seeks exclusion of Exhibits C and D to Cuozzo's declaration.

The former comprises three exhibits that Cuozzo prepared.

Exhibit C-1, titled "Plan Elevations," offers a visual comparison of the exterior frontages of each DB plan and the FWH plan that allegedly infringes it. (Doc. 89–3). Exhibit C-2, styled "Side-by-Side Layouts," depicts the blueprint of each DB plan adjacent to the blueprint of the

allegedly infringing FWH plan. (Doc. 89–4). Exhibit C-3, "Plan Overlays," depicts the blueprint for each DB plan laid on top of the allegedly infringing FWH plan, thereby permitting the fact-finder to observe how similar (or not) the parties' plans are.

Exhibit D, in turn, is a list of purported similarities that Cuozzo detected between DB's plans and FWH's allegedly infringing plans. (Doc. 89–6).

DB responds that Cuozzo may testify about "DB's design process, the creation of the 17 [works] at issue, how DB discovered Defendants' Accused Works, how he reviewed the Accused Works, and what prompted him to believe that they were copied from DB's Copyrighted Works[.]" (Doc. 171, PageID 7150).

It also contends that I should allow Cuozzo to "explain in detail" to the jury "what makes each [DB] plan 'original'" and what "features present" in the defendants' plans are "nearly identical" to DB's designs, "have no functional purpose[,]" and thus "evidence copying." (*Id.*). DB emphasizes that Cuozzo bases his opinions on the knowledge and experience he gained working for DB, rather than on any specialized or technical knowledge that might implicate Evidence Rule 702.

Regarding the pedagogical devices, DB argues that they are admissible because they "serve only to augment the visual comparison [of the allegedly infringing and infringed works] for the jury's consideration." (*Id.*, PageID 7153).

### 1. Admissibility of Opinion Evidence

"A witness may testify based on opinion, as opposed to testifying to facts of which he has direct knowledge, under two circumstances: as a lay person under Rule 701 or as an expert under Rule 702." *U.S. v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013).

"Such lay opinion testimony is permitted under Rule 701 because it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." *Id.* (internal quotation marks omitted). To ensure that lay testimony serves the "objective of putting the trier of fact in possession of an accurate reproduction of the event," *id.*, Rule 701 instructs that:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

"If a witness's testimony fails to meet any one of the three foundational requirements, it is not admissible." *Freeman*, *supra*, 730 F.3d at 596.

## 2. Analysis

I will grant the defendants' motion in part and deny it in part.

First, to the extent that Cuozzo proposes to testify about DB's design processes, how DB created the seventeen architectural plans at issue, and how Cuozzo came to learn about FWH and their designs, such testimony is not inadmissible under Rules 701 and 702.[1]

DB has represented, without contradiction from the defendants, that Cuozzo has worked for DB for more than thirty years, and that "he has personally observed and taken part in the creation of these designs[.]" (Doc. 171, PageID 7150). His experience provides an adequate

---

[1] Whether the defendants challenge this testimony on some other basis will raise issues for Judge Zouhary to resolve.

foundation for Cuozzo to testify about the areas outlined above. *U.S. v. White*, 492 F.3d 380, 403 (6th Cir. 2007).

Second, to the extent that Cuozzo intends to opine on the supposed "originality" of DB's architectural works, or the creativity inherent in them, he may testify only that DB and/or its agents and employees created the plans at issue.

As I explained at the summary-judgment stage, "[o]riginal, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 302 F. Supp. 3d 933, 941 (N.D. Ohio 2018).

For that reason, Cuozzo – who participated in the creation of some or all of the DB works at issue – may testify that DB and its employees, on their own, created those plans. But Cuozzo may not opine that the works are "original" in the sense that they possess "some minimal degree of creativity."

Whether Cuozzo, a lay witness, believes that the designs are original (and therefore entitled to copyright protection) is irrelevant and not helpful to the jury. Rather, the jury will be able to decide, based on the testimony it hears and its review of the architectural plans, whether DB's works possess a minimal degree of creativity. *See Freeman*, *supra*, 730 F.3d at 597.

Third, and for largely the same reasons, Cuozzo may not opine that DB's works and FWH's works are substantially similar.

"To generate an inference of copying, the copyright owner must show "(1) access to the allegedly-infringed work by the [infringer] and (2) a substantial similarity between the two

works at issue." *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 2017 WL 5444569, *1 (N.D. Ohio 2017).

"Because not all copying . . . is copyright infringement . . . the plaintiff must establish that the defendant's work is substantially similar to protectible elements of the plaintiff's work. Thus the term substantial similarity is properly reserved for similarity that exists between the protected elements of a work and another work." *Id.* (internal quotation marks and citations omitted).

Cuozzo, being only a lay witness, has no specialized knowledge or experience that would permit him to offer a helpful opinion – an opinion that the jurors could not form for themselves – as to what constitutes protected expression in either DB's or FWH's designs. Moreover, Cuozzo's opinion that the parties' works appear similar would not be helpful to the jury because it would "merely tell the jury what result to reach." *Freeman*, *supra*, 730 F.3d at 597.

Fourth, Exhibits C-1, C-2, and C-3 to Cuozzo's declaration are not inadmissible under Rules 701 and 702.

These exhibits present objective data – depictions of the exterior frontages of the parties' architectural plans, side-by-side-comparisons of the designs' blueprints, and an overlay of the blueprints – that are of obvious and extreme value to the jury. Indeed, if admitted, they would simplify the task of comparing the plans to determine whether they are substantially similar.

The defendants have not objected that the comparisons are inaccurate, unfairly prejudicial, or otherwise problematic. And while Cuozzo is not qualified to offer an expert opinion in this case, that does not mean he is unqualified to assemble Exhibits C-1, C-2, or C-3 or to testify about how he assembled those exhibits and what the comparisons show (*e.g.*, both parties' plans feature design component A in room B, design feature X in hallway Y, and so on).

Fifth, Exhibit D to Cuozzo's declaration – a lengthy list of the similarities that Cuozzo observed between the allegedly infringing and infringed plans – is likely inadmissible as substantive evidence, but, assuming it accurately reflects Cuozzo's testimony, it may be used by counsel as a demonstrative aide in presenting Cuozzo's testimony. Given my necessarily provisional understanding of Cuozzo's likely testimony I will leave it to the parties to seek further refinement of this ruling, if such is needed, before Judge Zouhary.

Sixth, because I hold below that Richard Kraly may not offer an opinion for the defendants that the parties' works are substantially similar, Cuozzo may not testify about the supposed discrepancies in Kraly's opinion.

## B. Lost Profits and PGS Works

FWH moves to bar DB from recovering any profits that FWH generated by constructing and selling homes that allegedly infringe the DB plans that are registered with the Copyright Office only as pictorial, graphic, or sculptural (PGS) works. (Doc. 154).

### 1. Parties' Arguments

"Until 1990, architectural works could be registered [for copyright protection] only as 'technical drawings' under the category of PGS works." *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 2018 WL 1583103, *10 (N.D. Ohio 2018). "A PGS copyright protected the underlying design from being copied, but it did not prevent the construction of a building based on those plans." *Id.* at *11; *see also*, *e.g.*, *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 572 F.3d 1218, 1231 (11th Cir. 2008) ("a PGS copyright cannot be infringed by an as-built structure").[2]

---

[2] In 1990, with the passage of the Architectural Works Copyright Protection Act, copyright protection extended to "architectural works," which the statute defined as the "design of a building as embodied in any tangible medium of expression, including the building, architectural plans, or drawings." 17 U.S.C. § 101.

FWH contends that DB registered ten of the plans at issue – the Kendall, Sherburne, Lancaster, Carrington, Galvin, Monte Vista, Harrisburg, Chandler, Ambrose, and Harrington plans – only as PGS works. (Doc. 154, PageID 6666).

Because building (and then selling) a home based on these PGS-copyrighted architectural plans would not constitute copyright infringement, FWH argues that DB cannot recover profits that it generated from building and selling homes based on DB's PGS works. FWH therefore asks me to hold that, with respect to any alleged infringements of the PGS works, DB can recover only those damages caused by the copying of the plans themselves (*e.g.*, the licensing revenues the defendants did not pay for using the DB plans).

DB makes two arguments in response.

First, it argues that four of the designs at issue are, in fact, registered with the Copyright Office as both PGS works and architectural works. (Doc. 170, PageID 7094). DB explains that it "inadvertently omitted" the corresponding registration materials from its summary-judgment filings, but "plans to present evidence at trial that these 4 works are protected as architectural works[.]" (*Id.*, PageID 7089 n.4).

Second, relying on the Sixth Circuit's decision in *Robert R. Jones & Assocs., Inc. v. Nino Homes*, 858 F.2d 274 (6th Cir. 1988), DB argues that the proper measure of damages from FWH's alleged infringement of the PGS works includes the profits that FWH generated by using the PGS works to design, build, and sell houses.

The district court in that case found that Nino Homes had copied a floor plan created by the plaintiff, Robert R. Jones & Associates, and used it to build (and sell) seven houses. *Nino Homes*, *supra*, 858 F.2d at 275–76. It awarded the Jones firm damages in the form of the "profits

it would have earned on the sale of additional houses had Nino Homes not used infringing copies of the [Jones] plans to build houses which it sold." *Id.* at 277.

On appeal, Nino Homes argued that this "'lost profits' standard" was improper. *Id.* It urged the Sixth Circuit to fix damages instead at "the fair market value of the architectural plans at the time of the infringement." *Id.*

The Circuit rejected that argument. After surveying the case law, the court held that the Jones firm was entitled to recover the profits that Nino Homes generated by using its plans to build and sell houses:

> [t]he rule which emerges from these cases is that one may construct a house which is identical to a house depicted in copyrighted architectural plans, but one may not directly copy those plans and then use the infringing copy to construct the house. As a logical extension of this rule, we hold that, where someone makes infringing copies of another's copyrighted architectural plans, the damages recoverable by the copyright owner include the losses suffered as a result of the infringer's subsequent use of the infringing copies.

*Id.* at 280.

### 2. Analysis

In light of *Nino Homes*, *supra*, I will overrule the defendants' motion.

That case holds, in rather plain terms, that when an infringer copies an architectural plan and "use[s] the infringing copy to construct [a] house," the damages caused by the infringement – *i.e.*, the copying – "include the losses suffered as a result of the infringer's *subsequent use of the infringing copies*." *Nino Homes*, *supra*, 858 F.2d at 280 (emphasis supplied).

As applied here, *Nino Homes* instructs that if DB were to prove that FWH copied the ten PGS-copyrighted plans and used those copies to build homes that it later sold, the profits that FWH generated through such sales would be an available form of damages.

FWH urges me to ignore *Nino Homes*, but I cannot do so.

FWH's first argument is that *Nino Homes* was wrongly decided. This is so, FWH maintains, because the case's lost-profits rule of is inconsistent with the principle that "the construction of a house from a PGS copyrighted home design does not infringe that copyright." (Doc. 154, PageID 7173). In other words, where there is no infringement, there can be no damages.

The main problem with this argument is that *Nino Homes*, which is binding on me, held that the revenue from such sales is an available form of damages. More to the point, *Nino Homes* is not inconsistent with the rule that an as-built structure does not itself infringe a PGS-copyrighted design.

*Nino Homes* did not hold that building a home based on a PGS-copyrighted design is copyright infringement. Rather, "[i]n an attempt to make up for a perceived deficiency in copyright law's protection of architectural structures," *Nino Homes* simply "calculated damages so as to include profits realized from the construction of works using infringing copies of technical drawings." *Nat'l Med. Care, Inc. v. Espiritu*, 284 F. Supp. 2d 424, 435 (S.D.W. Va. 2003) (citing *Nino Homes*, *supra*, 858 F.2d at 280).

Second, defendants argue that *Nino Homes* is distinguishable because the parties in that case were direct competitors whose competition "creat[ed] an overlap between the plaintiff's loss of profit from sales that presumably went to the defendant's gain from those same sales." (Doc. 154, PageID 7174).

But the holding of *Nino Homes* did not turn on the parties' competitive relationship. Instead, the Sixth Circuit broadly held that the available damages include the damages that result from a competitor's subsequent use of the infringing copies. *Nino Homes*, *supra*, 858 F.2d at 280.

The evidence in that case convinced the district judge that, but for Nino Homes' use of the Jones firm's plan to build and sell seven homes, the Jones firm itself would have sold seven homes. *Id.* at 276. Accordingly, the Sixth Circuit affirmed the district court's finding that the proper measure of damages was "the profits Jones Associates would have made on houses it would have sold but for Nino Homes' unauthorized duplication of the Aspen plans and Nino Homes' use of its infringing copies to build its Riverside houses." *Id.* at 281.

Whether the profits that FWH generated by selling homes based on DB's PGS works are, as a factual matter, "losses suffered as a result of [FWH's] subsequent use of the infringing copies" or, as the copyright statute puts it, "attributable to the infringement" will be a matter for the jury to decide. *See* 17 U.S.C. § 504 ("The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.").[3]

### C. Admissibility of the DB Spreadsheet

Defendants also move to exclude a spreadsheet that lists the 351 homes that one or more of the defendants allegedly built from a DB plan. (Doc. 160).

---

[3] My ruling moots FWH's argument that DB's failure to disclose that it had registered the Ambrose, Galvin, Harrisburg, and Shannon plans as architectural works should preclude DB from recovering the profits that FWH generated by allegedly using those designs to build and sell homes. Because lost-profits damages would be available even if those designs were registered only as PGS works, whether the designs are also registered as architectural works is not relevant. That said, nothing in this order should preclude defendants from renewing their objection at trial if DB sought to introduce those plans' registrations as architectural works for some other reason. DB's failure to disclose the registrations of these four designs as architectural works at any point during this litigation – including at summary judgment, when a focus of the litigation was on the scope and validity of DB's copyright registrations – ought to weigh heavily against its being able to prosecute its infringement claims vis-à-vis the Ambrose, Galvin, Harrisburg, and Shannon plans as architectural works.

For each of the homes at issue, the spreadsheet identifies: 1) the FWH plan used to build the home; 2) the DB plan that the FWH plan allegedly infringed; 3) the house's address; 4) the year the house was built; 5) which defendant built the home; and 6) the sale price. (Doc. 160–1, PageID 6862–6881).

FWH argues that the spreadsheet is inadmissible under Fed. R. Evid. 1006.

According to the defense, DB has not: 1) shown that the documents underlying the spreadsheet are "so voluminous as to require the use" of a summary; 2) provided the defense with all of the documents on which the spreadsheet is based; or 3) established that the underlying documents are themselves admissible. (Doc. 160, PageID 6853–56).

DB's response brief does not address these arguments in a meaningful way.

Instead, DB devotes nearly three-quarters of its brief to cataloguing, in needless and exhausting detail, the defendants' alleged shortcomings in producing information that DB needed to prepare the spreadsheet. (Doc. 169, PageID 7052–61). Based on those perceived blunders, DB contends, and because the defendants supposedly failed to comply with my prior orders to produce such information during discovery, they have no basis to object to the spreadsheet's admissibility.[4]

Then, ignoring the major premise of FWH's motion, DB argues that "there is no dispute that the documents and information underlying the spreadsheet are voluminous." (*Id.*, PageID 7062).

---

[4] Although I ordered FWH to produce, under penalty of perjury, the information that DB assembled into the spreadsheet, nowhere did I order, as DB implies, that once DB assembled the spreadsheet it would be admissible under Rule 1006 without regard to FWH's objections.

Based on the limited information before me, and in light of the singularly unhelpful briefing, I will grant FWH's motion, though without prejudice.

There is nothing before me that establishes whether, in fact, the documents underlying the spreadsheet are so voluminous as to necessitate its use. *See U.S. v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998). Such a showing is a "precondition[ ] to admitting a 1006 summary chart," and DB has not even tried to make that showing. *Id.*

That said, it would be wholly inappropriate to deny the jury access to a chart or summary like the spreadsheet, even though DB has not yet laid an adequate foundation that the spreadsheet is admissible.

The spreadsheet contains objective information that does not appear to be in dispute: namely, which plans FWH used to build a particular home, which DB plan FWH allegedly infringed, which defendant built the home, and the sale price. Much of this information, moreover, came from the defendants themselves. (Doc. 169, PageID 7062). Given the number of claims at issue, moreover, the information would seem to be of obvious value to the jury, at the very least as an organizational tool during their deliberations.

In these circumstances, the parties should be able to work together either to: 1) verify the accuracy of the information in the spreadsheet, so that they can stipulate to its accuracy; or 2) create a more acceptable spreadsheet, such as Exhibit C to DB's opposition brief (which eliminates much of the extraneous materials to which FWH objected, but which DB never disclosed until filing its opposition brief).

The parties' failure or inability to do so would needlessly prolong the trial, which is – and which the parties must, notwithstanding their scorched-earth approach to pretrial litigation,

understand is – unacceptable. Ultimately, however, I will leave it to Judge Zouhary's discretion to fashion a fair and reasonable solution to this issue.

### D. DB's Omnibus Motion

For its part, DB moves to exclude nine categories of evidence from the trial. (Doc. 158).

### 1. Richard Kraly's Testimony

DB first moves to exclude the opinions and declarations of FWH's expert, Richard Kraly. (Doc. 158, PageID 6816–21). Kraly, an Ohio architect, intends to opine that: 1) none of DB's plans contains protected expression; and 2) even if the plans did contain protected expression, FWH's plans are not substantially similar to DB's plans.[5]

DB argues that the former opinion is "moot" because, at the summary-judgment stage, I ruled as a matter of law that each of DB's plans contains protected expression. (*Id.*, PageID 6817–18). Regarding the latter opinion, DB argues that there is no need for expert testimony on the issue of substantial similarity, where the controlling test is whether the parties' designs appear similar to an ordinary observer. (*Id.*, PageID 6818–19).

FWH opposes the motion, arguing that my rulings at summary judgment did not find that DB's plans contain protected expression (Doc. 167, PageID 6953–54), and that Kraly's opinions on that subject will be helpful to the jury. It also argues that I have discretion to permit an expert to testify whether two parties' architectural designs would appear similar to an ordinary observer. (*Id.*, PageID 6955–56).

I will grant DB's motion in part and deny it in part.

---

[5] I have already excluded Kraly's first declaration to the extent that it expressed legal opinions characterizing DB's designs as too unoriginal to warrant copyright protection. *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 2017 WL 5467152, *4 (N.D. Ohio 2017). Accordingly, Kraly may not offer any such testimony at trial.

First, Kraly may opine, in light of his specialized knowledge and training as an architect, that DB's designs do not contain protected expression.

In his declarations, Kraly identifies multiple external considerations that allegedly deprive DB's plans of original, protected expression.[6] Such testimony may help the jury "filter out" the unprotected components, if any, of DB's plans and focus on the protected level of expression, if any, in the designs. *Kohus v. Mariol*, 328 F.3d 848, 855 (6th Cir. 2003); *see also Design Basics, LLC v. Drexel Bldg. Supply, Inc.*, 2016 WL 5794746, *2 (E.D. Wis. 2016) (holding that "an expert in architecture" could "identify engineering or design requirements that are common to all single-family homes; he could explain which features are common to a given style or floor plan; and he could identify aspects of room placement and flow that are inherent in home design").[7]

_____

[6] In moving for summary judgment on the issue of substantial similarity, the defendants relied on only four pages of Kraly's 137-page declaration. *Design Basics*, *supra*, 302 F. Supp. 3d at 942–43 & n.1. As my order explained, those portions of Kraly's report were conclusory, unsupported, and insufficient to warrant summary judgment. *Id.* at 945–48. Among the information that defendants failed to cite or discuss – despite my order directing them to cite the record to support their assertions and forbidding them from incorporating the experts' lengthy reports by reference – are detailed lists of the design choices in each DB plan that Kraly believes are not protected expression. Those summaries, combined with Kraly's general opinions that external considerations can limit the amount of original expression in an architectural plan, would seem to provide an adequate basis for Kraly to opine why a given DB plan contains only standard features or is otherwise not original.

[7] Contrary to DB's arguments, my denial of the defendants' motion for summary judgment on the issue of substantial similarity was not – certainly not by its terms or even by implication – a grant of summary judgment *to DB* on the ground that its designs contained protected expression.

The dispositive issue in that motion was what, exactly, constituted the protected level of expression in DB's architectural plans. *Design Basics*, *supra*, 302 F. Supp. 3d at 941–42. DB contended that copyright protection extended to the "overall form" or the "look and feel" of the homes, the "arrangement and composition of spaces and elements across the first and second floors" of the homes, the "program of the architectural work," the "three-dimensional alignment of the spaces and elements," and the "outside elevations." *Id.* at 942. Relying on Kraly's declarations, FWH contended that none of those elements was protectable. *Id.* After surveying

Second, Kraly may not opine whether DB's and FWH's plans are substantially similar.

The "traditional approach" for determining whether two works are substantially similar is the "ordinary observer" test, which "requires the trier of fact to gauge the similarities of the two works solely on the basis of his 'net impression' and without relying on expert analysis or dissection." *Kohus*, *supra*, 328 F.3d at 854 (some internal quotation marks omitted).

"[T]he inquiry in the second prong of the substantial similarity test should focus on the *intended audience*," which "will ordinarily be the lay public." *Id.* at 857 (emphasis in original). "[T]he finder of fact's judgment should" therefore "be from the perspective of the . . . ordinary reasonable person." *Id.*

Under *Kohus*, the jury's answer to the substantial-similarity question will turn on the jurors' own impressions of the works' similarities or differences – their sense, that is, as "ordinary observers" whether the plans' "aesthetic appeal" is essentially "the same." *Design Basics*, *supra*, 302 F. Supp. 3d at 950 (internal quotation marks omitted). Kraly's proposed testimony – *i.e.*, that he, not as an ordinary observer, but as an architect with special training and knowledge about the conventions of home designs, believes the designs are dissimilar – would not be helpful to the jury on this issue and is therefore inadmissible.

---

the case law, I resolved that dispute by concluding that "copyright law protects the arrangements of standard elements for which DB seeks protection." *Id.* at 945. Because DB held "certificates of copyright registration in the allegedly infringed works, I *presume[d]*" – rather than held as a matter of law – that "its designs satisfy the extremely low threshold for originality." *Id.* at 941 (internal quotation marks omitted and emphasis supplied). I then explained why Kraly's opinion, viewed in the light most favorable to DB, was insufficient to overcome the presumption and establish as a matter of law that any reasonable juror would find that DB's designs contained no protected expression.

The upshot of this ruling is that the existence of protected expression in DB's designs was then, and remains today, an issue for the jury.

## 2. John Gugliotta's Testimony

DB next moves to exclude the testimony of FWH's second expert, attorney John D. Gugliotta. (Doc. 158–1, PageID 6821).

Gugliotta prepared a report opining, *inter alia*, that DB's architectural plans contain no original expression and are ineligible for copyright protection. His report also contained a summary of his investigation into other issues at play in the case, including whether DB owns the copyrights for the designs at issue and whether any of the defendants had access to those plans. (Doc. 88–1).

In a prior order, I excluded Gugliotta's report to the extent that it set forth legal conclusions. *Design Basics*, *supra*, 2018 WL 1583103, *3–4. But I held that the report was admissible to the extent Gugliotta "recount[ed] personally observable facts relevant to FWH's defenses" of ownership, validity, and access. *Id.*

Accordingly, Gugliotta may not testify to any legal conclusions, but his testimony and report are admissible on the issues of: 1) DB's ownership of, the validity of, and defendants' access to DB's Ashton and Albany plans; 2) the defendants' access to the Tollefson and Kirby Farms plans; and 3) defendant Wehrle Development's access to all remaining plans.

## 3. "Independent Creation" Defense

DB moves to preclude the defendants from "introducing evidence in support of or in any way arguing that they independently created any of the Accused Works" – *i.e.*, the FWH plans that allegedly infringe DB's plans. (Doc. 158–1, PageID 6822).

Relying on Fed. R. Civ. P. 37(c)(1), DB argues that "[d]efendants have produced no evidence – nor provided any explanation – for the origin of [the] Accused Works." (*Id.*). It then points out that, during a status conference in July, 2016, the defendants represented that they

were withdrawing their "independent creation defense as to all designs . . . with prejudice" with the sole exception of FWH's Franklin design. (Doc. 89–1, PageID 3582).[8]

FWH does not dispute – much less acknowledge – any of the foregoing. (Doc. 167, PageID 6961–62). It instead argues that DB is mistaken that "independent creation" is an affirmative defense as to which FWH has the burden of proof.

According to FWH, because DB must prove that FWH copied its designs, FWH is entitled to present evidence to disprove that element of DB's claim. (*Id.*). That evidence apparently consists of testimony from Richard Wehrle, who executed a declaration in April, 2019 indicating, rather vaguely, that a predecessor company he formed in 1969 created some home designs that his sons ultimately had access to. (Doc. 167–1).

In reply, DB argues that FWH never tendered Wehrle's declaration or the exhibits attached to it during discovery (which closed in 2017) or before I decided the parties' dispositive motions (more than a year ago). (Doc. 177, PageID 7967). DB emphasizes that FWH's opposition brief makes no effort to show that its failure to do so was "substantially justified" under Rule 37(c)(1). Finally, DB reiterates that it made "countless requests" for evidence showing that, or an explanation how, FWH independently created the allegedly infringing works, but FWH never produced such evidence or explanation. (*Id.*, PageID 7966).

I will grant DB's motion, for to do otherwise would condone litigation tactics of the most misleading and underhanded sort.

Nearly three years ago, defendants represented to me and to DB in the plainest terms that the "[o]nly design as to which the independent creation defense may and will be offered is . . .

---

[8] Because DB has withdrawn its claim that the Franklin plan infringes one of its plans, whether FWH created the Franklin will not be an issue at trial.

the Franklin design[.]" (Doc. 89 –1, PageID 3583). DB sought that representation to assure itself, and the representation certainly caused me to believe, that FWH would not be presenting evidence that it or its agents independently created the allegedly infringing plans.

Furthermore, DB has represented – without contradiction from the defendants – that it had continually sought to learn from the defendants whether they would take the position that they created the works. Defendants responded not only with radio silence, but also with an unequivocal statement from their attorney, Robert H. Stoffers, that it had "withdrawn that defense" with prejudice. (*Id.*, PageID 3582–83).

In light of these events, it is far too late for FWH to say "gotcha" by injecting its independent-creation evidence – in the form of Wehrle's declaration and exhibits (which DB represents, again without contradiction, were never disclosed during discovery) – into the case.

Finally, whether the law properly classifies "independent creation" as an affirmative defense or a way of disproving an element of DB's claims is immaterial.

The defendants took the position that they would not offer an "independent creation defense," and that is the position to which they must adhere at trial. Allowing them to present such evidence on the theory that it is not part of an affirmative defense that they withdraw, but, rather, simply evidence rebutting DB's claims, would make their representations to me and DB entirely misleading and essentially meaningless.[9]

### 4. Originality of DB's Works

DB next argues that I should bar the defendants from offering evidence that its plans "lack originality or are otherwise not deserving of [copyright] protection." (Doc. 158–1, PageID

---

[9] Nor is it relevant that DB chose not to depose any of the individual Wehrles. (Doc. 167, PageID 6961). Why would DB bother when FWH had assured it that the Wehrles would have nothing to say about independent creation?

6822). It notes that I have ruled as a matter of law that DB's copyrights in eighteen designs are valid, which triggers a presumption that the works are original. *Design Basics*, *supra*, 2018 WL 1583103 at *13–16; *see also* 17 U.S.C. § 410(c); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004).

FWH responds that it is entitled to present evidence that the works are not original, including its evidence that Richard Wehrle independently created the designs at issue. (Doc. 167, PageID 6962–63).

I will deny the motion in part and grant it in part.

By virtue of my summary-judgment rulings, DB is entitled at trial to a presumption that its plans are "original." *Lexmark*, *supra*, 387 F.3d at 534. However, as already explained *supra*, my rulings did not establish as a matter of law that DB's designs contain original, protected expression. Rather, I determined only that copyright law protected the kinds of design features at issue in DB's works and presumed that those features constituted protected expression.

For these reasons, the defendants are entitled to introduce evidence that would overcome the presumption and prove that DB's designs are not, in fact, original. *Design Basics*, *supra*, 2018 WL 1583103 at *14. That said, under no circumstances may the defendants introduce evidence that they independently created the allegedly infringing works.

### 5. Non-Party Created Architectural Designs

DB also moves to prevent the defendants from trying to prove that its designs are not original with evidence that "other third party home designs may have similar features to any of DB's copyrighted works[.]" (Doc. 158–1, PageID 6823).The defendants respond that they are entitled to introduce Richard Wehrle's testimony "regarding the creation of various home designs and their evolution over time[.]" (Doc. 167, PageID 6963).

I will grant DB's motion to the extent DB directs it at the defendants' belatedly disclosed independent-creation evidence. This ruling should not, though, preclude the defendants from introducing evidence in other forms (such as Kraly's opinions) that DB's designs are unoriginal.

### 6. Licensed Architect

Next, DB argues that I should bar FWH from: 1) presenting evidence that a licensed architect did not create any of its designs; and 2) arguing to the jury that DB's designs are entitled to less copyright protection because an architect did not create them. (Doc. 158–1, PageID 6823). The defendants respond that DB has not justified this request, though they do not indicate whether they intend to offer such evidence. (Doc. 167, PageID 6963–64).

I will grant the motion. Whether an architect created DB's plans is not relevant to any issue in dispute at trial and defendants do not contend that they plan to introduce any such evidence. Furthermore, I presume that Judge Zouhary will instruct the jury on what DB must prove to convince the jury that its designs are entitled to copyright protection, and counsel's arguments to the jury about whether DB's designs are so protected should conform to those instructions.

### 7. Lost Licensing Revenue

DB also moves to bar the defendants from presenting evidence of the "actual damages" that their infringements caused, including "(1) fees DB could have charged for preparing the plans of the houses built by the Defendants; (2) the revenue or profit DB might have earned from providing such services; (3) the 'value' of DB's copyrighted floor plans; and/or (4) the revenues or profits DB could have or has earned from the licensing of such works for construction or promotion." (Doc. 158–1, PageID 6824).

Under the Copyright Act, a copyright holder who prevails on an infringement claim can recover either its "actual damages and any additional profits of the infringer" or "statutory damages." 17 U.S.C. § 504(a).

Here, DB intends to pursue only the defendants' profits "received through the advertising and sale of infringing homes constructed from DB's Copyrighted Works" and has disclaimed its right to seek "actual damages" in the form of lost licensing revenue. (*Id.*; *see also* Doc. 177, PageID 7972 (DB's representation that it "waives its right to seek damages for lost licensing revenue").

Because this motion relates to the issue of damages only, I will defer its adjudication to Judge Zouhary, thereby enabling him to decide in light of the evidence and outcome on the question of liability, or in some other fashion, what, if any, of those elements of damages the jury may consider.

### 8. DB's Litigation History

DB moves to preclude the defense from introducing evidence of, or referring in any way to, the number of previous infringement lawsuits that DB has filed; asserting that DB's business model is primarily to profit from copyright litigation; or characterizing DB as a "copyright troll," a "professional plaintiff," or a "vexatious litigant." (Doc. 158–1, PageID 6827–29).

FWH responds that it can introduce evidence of this sort to prove, first, that DB's claims are untimely. (Doc. 167, PageID 6969).

According to FWH, "if the evidence shows that DB's approach to the market and use of resources to seek out and pursue purported infringers put it on inquiry notice of potential infringement by Defendants before April 6, 2012, then its claims are time-barred[.]" (*Id.*). In support of that theory, FWH argues that DB knew "at least one of the Defendants had licensed

plans in the past and had received plan books from [DB], but had not sought to license any such plans for years prior to 2012." (*Id.*, PageID 6970).

FWH also contends that the "litigation history" evidence is relevant to proving its "'unclean hands' defense, under which the copyright abuse/misuse defense arises." (*Id.*).

The crux of this defense is FWH's assertion that, even though "many elements of [DB's] designs are . . . generic or unprotected or unprotectable" under copyright law, DB has filed more than one hundred lawsuits seeking to force a settlement or obtain damages from design firms and home builders who allegedly copied the non-copyrightable designs. (*Id.*, PageID 6972–73).

### a. Timeliness

I will deny DB's motion to the extent that it seeks to prevent FWH from using the "litigation history" evidence to prove that DB's claims are untimely.

To be sure, I previously denied FWH's motion for summary judgment on statute-of-limitations grounds. *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 305 F. Supp. 3d 788 (N.D. Ohio 2018). In doing so, however, I viewed the evidence in the light most favorable to DB and concluded that a reasonable jury could find that DB was not on inquiry notice of FWH's alleged infringements before Cuozzo in fact discovered them in March, 2013:

> According to defendants, DB should be chargeable with the knowledge that FWH allegedly infringed its copyrighted works. This is so, FWH maintains, because "the current ownership of DB acquired their interest in the company expressly because of the potential for copyright infringement cases that 'have become a principal revenue stream for [DB].'" In this vein, FWH observes that DB uses a "bounty program" whereby it encourages its employees to look for potential copyright infringements on the Internet and pays them a finder's fee if the employee's research leads to a successful infringement suit. Finally, defendants emphasize the sheer number of infringement suits that DB has filed – at least 100 suits across the country since 2009, the majority of which DB filed in or after 2013.

* * *

Viewing the evidence in the light most favorable to DB, a reasonable jury could find that DB had no reason to know of FWH's infringing conduct until Cuozzo discovered it in early March, 2013.

Most importantly, FWH was one of DB's customers: FWH licensed two of DB's architectural works, and DB, whether on its own initiative or at FWH's request, sent FWH copies of its plan catalogs. As DB observes, "[d]efendants appeared to be law-abiding customers, following the licensing requirements spelled-out on DB's plan catalogs." There is simply is no evidence – at least FWH has cited none – that DB had reason to think that FWH might be infringing its works before Cuozzo discovered the infringements in March, 2013.

Furthermore, FWH cites no authority to support its argument that, simply because DB began aggressively to pursue copyright-infringement cases – against different defendants – in 2009, DB was on inquiry notice of FWH's – and, by implication, every other bad actor's – infringing conduct.

This omission is not surprising, given that inquiry notice, at least for a copyright-infringement claim, is necessarily defendant-specific. Indeed, even a case on which FWH relies on – *Warren Freedenfeld Assoc., Inc. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008) – recognized that the relevant question is whether the plaintiff had "some reason to investigate whether he may have suffered an injury at the hands of a *putative infringer*." (Emphasis supplied); see also *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 615 (7th Cir. 2014) (inquiry notice is defendant-specific).

Accordingly, that DB had reason to know that others – indeed, many others – had allegedly infringed its copyright works does not compel a reasonable jury to find that it also had reason to think FWH, too, had infringed its works.

*Id.* at 794–95 (most internal citations omitted).

However, DB did not seek summary judgment on this issue, and thus I have not ruled that FWH's evidence is insufficient to permit a rational jury finding that DB knew or should have known that FWH had infringed its designs. Accordingly, it will be for the jury to decide whether DB's claims are timely. What shape the defendants' evidence should take, any limits on such evidence, and whether DB is entitled to a jury instruction to the effect that it had no duty or obligation to search out copyright infringement, will be matters for the parties to resolve before Judge Zouhary.

## b. Copyright Misuse

However, I will grant the motion to the extent that the evidence bears on FWH's defense of copyright misuse.

"The doctrine of copyright misuse" – which the Sixth Circuit has neither recognized nor rejected – "prohibits a copyright holder from using a copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office and which is contrary to public policy." *Design Basics, LLC v. Petros Homes, Inc.*, 240 F. Supp. 3d 712, 720 (N.D. Ohio 2017) (Parker, J.) (internal quotation marks and brackets omitted).

"To assert copyright misuse, defendants must establish that plaintiff violated antitrust laws, plaintiff unlawfully extended the scope of the monopoly granted under its copyright or violated the public policy behind copyright laws." *Malibu Media v. Doe*, 2014 WL 2616902, *4 (E.D. Mich. 2014).

The defense "functions as an absolute bar on recovery for copyright plaintiffs who have attempted to extend their limited rights to property not covered by the copyright." *Petros Homes*, *supra*, 240 F. Supp. 3d at 720.

As proposed by FWH, the defense of copyright abuse in this case depends on proof that "many elements of the plaintiff's design plans are . . . generic or unprotected or unprotectable[.]" (Doc. 167, PageID 6972). Stated another way, FWH wants to argue that DB has copyrighted architectural plans that, in fact, contain no original expression and used the purported monopoly that the copyrights give DB principally to extort damages from design firms and home builders.

But this is precisely the defense that FWH already intends to offer on the issue of unlawful copying: because there is no protected expression in the DB plans, DB cannot prove

that FWH's designs are substantially similar to its own "at the protected level of expression." *Design Basics*, *supra*, 302 F. Supp. 3d at 941.

Because both defenses turn on whether DB's plans contain protected expression, FWH need not invoke the copyright-misuse defense to make that critical point to the jury.

In any event, the likelihood of undue prejudice, confusing and misleading the jury, and needlessly prolonging the trial substantially outweigh whatever possible relevance the "litigation history" evidence. *See* Fed. R. Evid. 403.

For one thing, the evidence that DB has filed more than 100 infringement lawsuits would inevitably invite the jury to speculate or infer that DB is a vexatious litigant or a "copyright troll." Such speculation would not only distract the jury from the real issues, it would also significantly prejudice DB's efforts to prove that its architectural plans are entitled to copyright protection, and to make out the other elements of its claims.

If FWH proposes offering not just the number of lawsuits, but their outcomes, the prejudice would be difficult to counter and overcome. Were the jury to also learn that courts had dismissed DB's suits without a trial due to the lack of litigable merit, the prejudice would be well nigh irresistible. Finally, if the jury heard that other courts had opined that DB was a copyright troll, as the Seventh Circuit has, that risk would be absolute.

Moreover, the sheer volume of the litigation history evidence risks confusing the jury and raises the specter of multiple mini-trials of substantial length on DB's past lawsuits and strategy. Such a course of proceedings ought to be avoided, especially where FWH retains the ability raise the gravamen of its misuse contention: that DB's plans are not entitled to copyright protection.

### 9. Parties' Current Financial Condition

The final component of DB's omnibus motion is its request to bar evidence of any party's "current business or financial condition." (Doc. 15–1, PageID 6829).

FWH responds that DB's motion is too vague to allow it to offer a proper response. (Doc. 167, PageID 6974). It also contends that the "parties' financial conditions will be relevant" on the issue of damages and, as well, on its statute-of-limitations defense. (*Id.*, PageID 6975) ("As for [DB's] financial condition, evidence of market downturns and sales losses bear directly on the question whether [DB] was on inquiry notice of Defendants' alleged infringements more than three [3] years prior to the April 2015 inception of this matter.").

Given the vagaries of DB's motion and the difficulty of determining at this juncture whether and to what extent evidence of the parties' financial conditions will be relevant at trial, I do not believe it is appropriate to adjudicate this motion now. Rather, I will refer it to Judge Zouhary for his consideration as the contours of the trial and conflicting evidence become clearer in the courtroom.

### E. *Daubert* Challenge to Brian Russell

The final motion in limine is DB's motion to exclude the opinions and testimony of the defendants' damages expert, Brian Russell. (Doc. 159). DB argues that Russell's testimony is inadmissible under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), because: 1) Russell based his opinions on "insufficient facts"; 2) his methodology is unreliable.

Having reviewed this motion and the defendants' response, I believe it is appropriate to refer this motion to Judge Zouhary for adjudication. Because the motion relates only to a damages issue, it seems most practical to address the motion only if DB prevails on the issue of

FWH's liability. Alternatively, it may be the case that a *Daubert* hearing is warranted, and Judge

Zouhary will be in a better position than I to hold such a hearing forthwith before trial begins.

## Conclusion

It is, therefore,

ORDERED THAT:

1.  FWH's motion to exclude the testimony and declarations of Carl Cuozzo
    (Doc. 153) be, and the same hereby is, granted in part and denied in part as
    provided herein.

2.  FWH's motion to bar DB from recovering damages in the form of profits FWH
    generated through the sale of homes based on DB's PGS works (Doc. 154) be,
    and the same hereby is, denied.

3.  FWH's motion to exclude the spreadsheet evidence (Doc. 160) be, and the same
    hereby is, granted without prejudice as provided herein.

4.  DB's omnibus motion (Doc. 158) be, and the same hereby is, granted in part and
    denied in part as provided herein.

5.  DB's motions to exclude evidence of its lost licensing revenue (Doc. 158–1,
    PageID 6823–26); the parties' current financial conditions (Doc. 158–1, PageID
    6829); and the opinions and testimony of Brian Russell (Doc. 159) be, and the
    same hereby are, referred to the Honorable Jack Zouhary for adjudication.

6.  The parties' motions for leave to exceed page limitations (Docs. 165, 173) be, and
    the same hereby are, granted.

7.      In accordance with the order of April 22, 2019 (Doc. 172), this case be, and the

        same hereby is, transferred to the docket of the Honorable Jack Zouhary for all

        further proceedings.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge